Jane P. Davenport (CA Bar No. 193275)
DEFENDERS OF WILDLIFE
1130 17th Street NW
Washington, DC 20036
(202) 772-3274
jdavenport@defenders.org

*Attorney for Plaintiff Defenders of Wildlife*

*(Additional counsel listed in signature block)*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DISTRICT**

DEFENDERS OF WILDLIFE,

Plaintiff,

v.

U.S. FISH AND WILDLIFE SERVICE and NATIONAL MARINE FISHERIES SERVICE,

Defendants.

Case No. 3:26-cv-07507-VC

**FIRST AMENDED COMPLAINT**

Endangered Species Act and Administrative Procedure Act Case

## INTRODUCTION

1. This action challenges the U.S. Fish and Wildlife Service's (FWS) and the National Marine Fisheries Service's (NMFS) (collectively, the Services) rescission of their longstanding regulatory definitions of "harm" under the Endangered Species Act (ESA) and the Services' decision, for the first time in fifty years, to exclude significant habitat modification and degradation that kills or injures ESA-listed species of wildlife from their interpretation of what constitutes "take" under the ESA. To justify the rescission, the Services adopted an extremely narrow interpretation of the statutory term "take" as limited to affirmative acts directed immediately and intentionally at particular animals. This interpretation conflicts with the ESA's plain language, structure, and conservation purpose, as well as congressional intent.

2. When Congress enacted the ESA in 1973, it recognized that habitat loss is a leading cause of species extinction and biodiversity loss in the United States and around the world. Converting natural landscapes to human-dominated land uses—like residential, commercial, and agricultural development, as well as logging, energy production, and mining—adversely affects native species and contributes to their population decline in many ways. Among other effects, it eliminates and fragments habitats; isolates populations of species from each other, reducing mating opportunities and genetic diversity; reduces the availability of forage and prey; blocks travel and migration routes; and facilitates the spread of invasive species that compete with or prey on native species. Fundamentally, it deprives species of the resources they need to survive and recover.

3. Habitat loss occurs in the United States at a staggering rate. From 2001 to 2017, more than two football fields' worth of natural area were lost to development *every minute*. Unsurprisingly, habitat loss is a driver of decline for ninety percent of the species listed as endangered or threatened under the ESA—over 1,400 species.

4. Given the indisputable link between habitat destruction or degradation and species decline and extinction, Congress enacted the ESA "to provide a means whereby ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation" of such species. 16 U.S.C. § 1531(b).

5. Congress explicitly intended that the federal government would not simply save imperiled species from extinction but ensure their full recovery. It defined "conserve," "conserving," and "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3). To effectuate the ESA's purposes, Congress declared its policy that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the ESA]." *Id.* § 1531(c)(1).

6. Congress gave the Services many tools to carry out the ESA's goal of halting species' slide toward extinction and fully recovering them, including by prohibiting the

unauthorized "take" of endangered and, in certain instances, threatened wildlife species, *see id.* §§ 1533(d), 1538(a). "Take" is defined by statute to include, among other things, "harm," *id.* § 1532(19).

7. In keeping with Congress's intent—as well as common sense and the science regarding the existential threat habitat loss poses to species—FWS defined "harm" through regulation to include habitat destruction in 1975, just two years after the ESA's enactment, and slightly modified that regulation in 1981. NMFS promulgated its own parallel interpretation in 1999. This understanding of "harm" has thus informed the Services' implementation of the ESA nearly since its inception. By a 6-3 vote, the Supreme Court upheld FWS's 1981 regulation in *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995) (*Sweet Home*).

8. Since the Act's passage up until the Final Rule's rescission of the harm regulations and reinterpretation of "take" (including "harm") (Rescission), the Services interpreted "take" to prohibit not only direct intentional take but also take that occurs incidental to otherwise lawful activities unless authorized by the Services under conditions designed to minimize and mitigate the impact on the species.

9. However, the Services have suddenly abandoned their longstanding interpretation of "harm" and rescinded their regulations defining the term. Instead, they now assert that "harm" cannot be construed to include significant habitat degradation or modification that kills or injures wildlife and that, instead, section 9's "take" prohibitions apply only to a narrow class of acts done directly and intentionally to particular animals. Rescinding the Definition of "Harm" Under the Endangered Species Act, 91 Fed. Reg. 43,300, 43,301 (July 14, 2026) (Final Rule) (citing Justice Scalia's dissenting opinion in *Sweet Home*, 515 U.S. at 719–20). The Rescission took effect September 14, 2026.

10. The sole rationale for their action is that the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) (*Loper Bright*), requires them to rescind the longstanding regulatory definitions of harm as they do not accord with the Services' new understanding of the "single, best meaning of the statute." 91 Fed. Reg. at 43,301. The Services explicitly adopt the rationale of Justice Scalia's *Sweet Home* dissent, where he would have held

that the statutory term "take" applies only to an "affirmative act directed immediately and intentionally against a particular animal—not an act or omission that indirectly and accidentally causes injury to a population of animals." *Id.* at 43,303, 43,305, 43,306 (cleaned up); *see also id.* at 43,301 ("We adopt Justice Scalia's rationale as articulated in *Sweet Home* and conclude that the Services' regulatory definitions are unlawful[.]").

11. The Rescission weakens some of the ESA's most important tools for protecting species by protecting their habitats, including section 9's prohibition on unauthorized take; section 7 consultations, biological opinions, and incidental take statements; and section 10 incidental take permits and habitat conservation plans. For decades, the Services utilized these tools to regulate, minimize, and mitigate habitat loss. But the Rescission will now allow unmitigated habitat modification and degradation that kills or injures ESA-listed species, pushing them further away from recovery and closer to extinction.

12. While the Services make clear their intent to exclude habitat modification and degradation that kills or injures ESA-listed wildlife from their interpretation of what constitutes prohibited "take" under the ESA, their reinterpretation of the statutory term "take" also signals an intent to forego regulating effectively all "incidental take," including that not caused by habitat destruction. Yet the Services do not explain, or even acknowledge, the profound impacts of this sea change in statutory interpretation.

13. The Services' Rescission lacks any reasoned basis and is arbitrary and capricious. They undertook no reasoned analysis of the extraordinary impacts of their action: not in the preamble to the Proposed Rule, not in the preamble to the Final Rule or in responses to comments, and not in any other supporting documentation.

14. By adopting the extremely narrow interpretation of "take" as set forth in Justice Scalia's *Sweet Home* dissent as the rationale for the Rescission, the Services have abused their discretion and acted contrary to law and in excess of statutory jurisdiction, authority, or limitations.

15. The Services also failed to ensure against the likelihood of jeopardizing the continued existence of endangered and threatened species, or adversely modifying their critical

habitats, when they failed to analyze the impacts of the Rescission in violation of Section 7(a)(2) of the ESA. They similarly failed to comply with environmental impact analysis requirements under the National Environmental Policy Act (NEPA) that act as guardrails to ensure agencies and the public are "aware of the environmental consequences" of the agencies' proposed actions. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 177 (2025).

16. The Rescission is thus unlawful and must be set aside.

17. To remedy these violations of law, Plaintiff seeks an order from this Court declaring the Rescission invalid, vacating the Rescission and prohibiting the Services from relying on it, and reinstating the longstanding regulatory definitions of "harm."

## JURISDICTION

18. This Court has jurisdiction under 16 U.S.C. § 1540(c) (ESA citizen suit provision) and 28 U.S.C. § 1331 (ESA, NEPA, and APA) because this case presents a federal question under the laws of the United States.[1] An actual, justiciable controversy exists between the parties. U.S. CONST. art. III, § 2, cl. 1. The requested relief is proper under 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 701–706, and 16 U.S.C. § 1540(g)(1). The APA waives the Services' sovereign immunity. 5 U.S.C. § 702.

## VENUE

19. Venue in this Court is proper under 28 U.S.C. § 1391(e)(1). This action is brought against the Services, two agencies of the United States. NMFS maintains California Coastal Offices in Santa Rosa and Arcata, California, within this district. FWS maintains a field office in Arcata, California, within this district. These offices and their officials work to implement the ESA, including by evaluating the impacts of proposed federal actions on endangered and threatened species pursuant to section 7 of the ESA and authorizing any resulting incidental take,

[1] On July 14, 2026, Defenders of Wildlife sent a Notice of Violation of the ESA to Doug Burgum, Secretary of the Interior; Howard Lutnick, Secretary of Commerce; Brian Nesvik, FWS Director; and Eugenio Piñeiro Soler, NMFS Director, in accordance with the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(2)(A)(i), informing them of Defenders' intent to sue FWS and NMFS for violations of ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), in connection with the issuance of the Final Rule. More than 60 days have passed since the Notices of Violation were received.

and engaging in incidental take permitting where no federal agency action is involved pursuant to section 10 of the ESA. There are approximately twenty-four species of wildlife within the jurisdiction of the Arcata FWS field office that are either ESA-listed or are proposed or candidates for ESA listing. And NMFS' California Coastal Offices protect ESA-listed species and habitats over the entirety of the California coast and its associated watersheds, including the Klamath River Basin. As such, a substantial part of the events or omissions giving rise to the claims occurred in this district and the consequences of these events or omissions will be felt within this district.

## DIVISIONAL ASSIGNMENT

20. Defendant NMFS maintains an office in Santa Rosa, California, which is in Sonoma County and the San Francisco and Oakland Divisions. Defendant NMFS and Defendant FWS maintain offices in Arcata, California, which is in Humboldt County and the Eureka Division. *See* Civil L.R. 3-2 (c)–(f).

## PARTIES

### Plaintiff

21. Plaintiff Defenders of Wildlife (Defenders) is a nonprofit 501(c)(3) membership organization dedicated to the protection of all native animals and plants in their natural communities. In particular, Defenders works to protect and restore America's wildlife species at risk of extinction and the habitats on which they rely. Founded in 1947, Defenders is headquartered in Washington, DC and has approximately 1.8 million members and supporters across the United States, of which approximately than 230,000 are members. It has more than 240,000 members and supporters in California, of which nearly 30,000 are members.

22. Defenders has staff in Alaska, Arizona, California, Colorado, the District of Columbia, Florida, Idaho, Illinois, Maryland, Montana, New Mexico, New York, North Carolina, Oregon, Texas, and Washington, whose work focuses on conservation of wildlife species and their habitats nationwide, from the gray wolf, Florida manatee, and from the northern spotted owl to the red-cockaded woodpecker to name just a few. Defenders has field programs focused on Alaska, California, the Northwest, the Rocky Mountains & Great Plains, the Southwest, and

the Southeast, as well as programs focused on public lands and ocean conservation.

23. Defenders' California Program staff members reside and work in Mendocino, Monterey, and Sacramento Counties, and their work focuses on conservation of wildlife and their habitats throughout the state.

24. For decades, Defenders' California Program has worked on issues unique to the state and represented the interests of Defenders' members and staff who live in or travel to California to enjoy its rich landscapes and biodiversity. Many species that rely on California habitats for all or part of their ranges are listed as endangered or threatened under the ESA, including the majestic California condor, the colorful San Francisco garter snake, the elusive San Joaquin kit fox, and the stocky California tiger salamander. Nearly half of the state consists of federal lands, with nine national parks, including Pinnacles and Redwood; eighteen national forests, including Los Padres, Mendocino, and Six Rivers; three dozen national wildlife refuges, including Humboldt Bay, the Marin Islands, and Don Edwards San Francisco Bay; national monuments like Muir Woods and Berryessa Snow Mountain; national seashores like Point Reyes; approximately fifteen million acres of BLM-managed lands; and more.

25. Defenders' California Program works across the state to conserve species and their habitat and to protect public lands, including through litigation, education, and advocacy. The California Program partners with federal, state, local, and Tribal governments, as well as communities, other conservation groups, and private landowners to achieve these goals.

26. In California, Defenders has brought suit to protect ESA-listed species from habitat destruction and degradation. For example, it litigated to protect the Panoche Valley in San Benito County—an ecologically sensitive and unique area that is home to the San Joaquin kit fox, blunt-nosed leopard lizard, and giant kangaroo rat—from development that would have destroyed the habitat of these and other species. It also litigated to prevent the diversion of water from the Klamath River—which flows through Siskiyou, Del Norte, and Humboldt Counties—that would have reduced flows below the minimum levels required for threatened coho salmon to spawn.

27. The California Program's advocacy campaigns have included successful efforts to

help establish, protect, and expand the Berryessa Snow Mountain National Monument in Napa, Lake, Mendocino, Glenn, Colusa, Yolo, and Solano Counties, which provides valuable habitat for a vast array of species, including the foothill yellow-legged frog and California red-legged frog. The California Program has conducted outreach and promoted coexistence to support a stronghold of southern sea otters in Elkhorn Slough and Moss Landing in Monterey County. And it has utilized policy, regulatory, and legal tools to improve freshwater flows in the San Francisco Bay-Delta Estuary and its tributaries, home to anadromous fish, like salmon and steelhead, and estuary fish, like the Delta smelt.

28. Defenders brings this action on behalf of its members. Defenders' members have interests in protecting species and their native habitats. They enjoy wildlife and wild places close to their homes and throughout the country. Defenders' members have protectable interests in ESA-listed species and the habitats those species call home that are negatively affected by the Rescission. Defenders alerted its members and supporters when the Services proposed the Rescission, and they submitted over 6,000 comments opposing the proposal, with over 900 comments coming from members and supporters in California. Defenders also submitted organizational comments opposing the Rescission. Defenders' members have scientific, aesthetic, recreational, conservation, economic, educational, and other interests in ESA-listed species and habitats. They have recreated in these habitats to enjoy these species and the ecosystems of which they are part.

29. For example, Joseph Vaile is a Defenders employee and member who resides in Ashland, Oregon. Mr. Vaile has spent decades working to protect species and habitats in the Pacific Northwest and Northern California. He currently serves as a Senior Representative for Defenders' Northwest Program where his work focuses on large-scale planning processes, like the Northwest Forest Plan, and their impacts on at-risk and federally listed threatened and endangered species, including the northern spotted owl, marbled murrelet, and Sierra Nevada red fox, among others. He runs and bikes in the Rogue River-Siskiyou National Forest on a weekly basis. He rafts or kayaks on the Rogue, Smith, and Klamath Rivers a few times a year, where he enjoys looking for listed salmonids. In August 2026, he kayaked on a portion of the Smith River

in Del Norte County, California, where threatened green sturgeon have been detected recently. While he did not see any, he learned that others nearby saw some the day he was there, but he will look for them again when he returns next summer. Through his work with Defenders, he understands the importance of taking habitat-based harm into account in planning, management, and conservation measures like biological opinions and habitat conservation plans. He is concerned that the Rescission will result in the exclusion of the consideration of habitat-based harm from these measures and is concerned about the impact this will have on the listed species he enjoys.

30. For example, the Northwest Forest Plan, which covers several national forests, including the Rogue River-Siskiyou National Forest, is currently undergoing an amendment process, in which the U.S. Forest Service could open large areas of federal land in California, Oregon, and Washington to logging and road construction that were previously off-limits to such activities to conserve old growth forest. The U.S. Forest Service will have to engage in section 7 consultation regarding this amendment. In the past, such a consultation would have accounted for the significant habitat-based harm an expansion of logging and road construction will have on old growth forest-dependent species like the northern spotted owl and the coastal marten. However, following the Rescission, Mr. Vaile is concerned that it will not, and that as a result, his ability to view these species when running and biking weekly in the Rogue River-Siskiyou National Forest surrounding his home in Ashland, Oregon, or during his raft trips, will be injured.

31. Mr. Vaile also regularly takes summer trips to the northern California coast with his family to camp and hike on lands near private lands owned by Green Diamond Resource Company, a privately owned timber company. They camped and hiked in the Smith River National Recreation Area in late August 2026, and saw Cooper's hawk, rough-skinned newt, and other birds and reptiles. They kept their eyes and ears open for marbled murrelet and northern spotted owl. They plan to return next summer. Currently, Green Diamond is seeking approval from FWS for a proposed habitat conservation plan and incidental take permit that will provide incidental take coverage to Green Diamond for the impacts its timber harvest activities will have

on marbled murrelet habitat, resulting in their injury and death. Previously, such impacts were covered under the now-rescinded regulatory definition of harm. In exchange for the authorization of limited incidental take, Green Diamond has agreed to take actions to minimize and mitigate the impacts of that take, including the commitment not to harvest trees in any known or presumed occupied marbled murrelet habitat within the area covered by the habitat conservation plan. If marbled murrelet habitat is protected adjacent to the areas Mr. Vaile visits and recreates with his family, it is more likely that he will have the opportunity to view marbled murrelets while recreating there. However, following the Rescission, Mr. Vaile is concerned that FWS will no longer require Green Diamond to minimize and mitigate any activities that kill or injure ESA-listed species by modifying or destroying their habitats to receive authorization for incidental take. He fears that any habitat conservation plan approved post-Rescission would require significantly fewer minimization and mitigation efforts than would a pre-Rescission habitat conservation plan, and as a result, less marbled murrelet habitat will be protected. This would make it less likely that Mr. Vaile will have the opportunity to view marbled murrelets during his family trips to the northern California coast. At the very least, Mr. Vaile is concerned that the Rescission is likely to delay the incidental take permit and habitat conservation plan's finalization and delay the implementation of these measures, similarly adversely affecting his ability to view and enjoy marbled murrelets adjacent to Green Diamond's private holdings.

32. Sophia Markowska is a Defenders employee and member who resides in Sacramento, California. A native of California, she is a Senior Representative for Defenders' California Program where she works to protect the habitat of the endangered San Joaquin kit fox. The San Joaquin kit fox's habitat has been reduced to a fraction of its original range. What is left is highly fragmented and at risk of further destruction by utility-scale renewable energy projects. Ms. Markowska works with federal, state, and county governments, as well as private companies and individuals, to try to prevent these projects from being sited in important San Joaquin kit fox habitat and to mitigate the impacts of these projects thoughtfully and strategically by acquiring and preserving land that increases connectivity and eases "pinch points" between different areas of habitat. As part of this work, Ms. Markowska goes out into San Joaquin kit fox habitat,

looking for the foxes, their dens, and other signs of the species. She first saw kit fox during a workshop held at California State University Bakersfield in April 2024; took her husband kit fox spotting for the first time in January 2026, where they saw kit fox in Bakersfield and its habitat in Kern National Wildlife Refuge; and visited a San Joaquin kit fox satellite population area in the Cuyama Valley with a friend in March 2026. In June 2026, she and her husband looked for kit fox in the Carrizo Plain National Monument, and she intends to continue looking for kit fox and enjoying spending time in their habitat in the future. She is attending for a kit fox workshop put on by the Central Coast Chapter of the Western Section of the Wildlife Society to be held in the Carrizo Plain in late September and early October 2026, and in March 2027, she intends to return to San Joaquin kit fox urban habitat in Bakersfield and look for kit fox there when she attends the annual Natural Communities Conference. Ms. Markowska is concerned that the Rescission will make it harder to protect and enhance San Joaquin kit fox habitat through compensatory mitigation measures, and that her ability to see kit fox and her enjoyment of future visits to San Joaquin kit fox habitat will be diminished if their habitat is further degraded and fragmented.

33. Pamela Flick is a Defenders employee and member who resides in Orangevale, California, and is Defenders' California Program Director. For over twenty-one years at Defenders, Ms. Flick has advocated for strong implementation of the ESA, including habitat protection for listed species. Her varied work has included efforts to establish and expand the Berryessa Snow Mountain National Monument that provides habitat for many endangered and threatened species and to advocate for revised national forest plans in the Sierra Nevada to protect the habitat of ESA-listed species like the endangered Sierra Nevada yellow-legged frog, endangered mountain yellow-legged frog, and threatened Yosemite toad, as well as the endangered Southern Sierra Nevada distinct population segment of the Pacific fisher. Like other Defenders' members who live in or visit California, Ms. Flick enjoys wildlife watching, plant and wildlife species identification, outdoor photography, fishing, and hiking, activities that often take her into the habitats of threatened and endangered species in California. One such species is the endangered Sierra Nevada distinct population segment of the Sierra Nevada red fox, one of

the most imperiled mammals in North America. Ms. Flick regularly visits the Sierra Nevada to recreate. She leads hiking trips nearly every summer in the central Sierra Nevada, during which she looks for the fox and any signs of its presence. Ms. Flick joined numerous field biologists for a training on the Eldorado National Forest in September 2025, led by fox expert Dr. Ben Sacks, to learn about protocols for Sierra Nevada red fox scat searching, such as how to collect and preserve any scat samples found. She has plans in the future, including in summer 2027, to lead another hiking trip in Sierra Nevada red fox habitat and will continue to look for the fox and signs of its presence. She is concerned that the Rescission and the subsequent weakening of ESA provisions that protect species by protecting their habitats will negatively affect her professional work and the work of her staff and negatively affect her aesthetic and recreational interests in visiting the places that are habitat for the ESA-listed species she enjoys in hopes of seeing these animals, particularly the Sierra Nevada red fox in the central Sierra Nevada.

34. Christian Hunt is a Defenders employee and member who resides in Charlotte, North Carolina. Mr. Hunt has devoted his career to advancing environmental protection and species conservation. He has worked for Defenders since 2016 and currently serves as the Director of the National Wildlife Refuges and Parks Program. In this capacity, he works to ensure that habitats necessary for the survival of threatened and endangered wildlife on these public lands are protected. He led a campaign to combat proposals for mining that threatened to harm Okefenokee National Wildlife Refuge in Georgia, a vibrant and diverse ecosystem that supports the ESA-listed red-cockaded woodpecker and Eastern indigo snake. And he worked to protect Rocky Fork State Park in Tennessee from a roadbuilding project that would have bisected valuable wildlife habitat. As an avid birder who seeks to view long-distance migratory birds such as piping plovers, semipalmated sandpipers, ruddy turnstones, and rufa red knots, he travels as often as he can from his home in Charlotte to look for these species on South Carolina beaches, and he plans to go again in 2027 during the spring migration season. Both piping plovers and rufa red knots are listed species that depend on very particular coastal habitat for roosting and feeding. In addition to recreating to see these species, Mr. Hunt has spent years working to protect red knots in South Carolina. He developed a report and participated in advocacy and

litigation to limit horseshoe crab harvesting, whose eggs are a critical forage resource for red knots, on South Carolina beaches, including Cape Romain National Wildlife Refuge. Mr. Hunt is concerned that the Rescission will allow projects to destroy the sensitive coastal dunes and mudflats that red knots and piping plovers depend upon, undermining both his professional work to protect listed shorebirds and his ability to enjoy these species in the wild.

35. Elizabeth Fleming is a Defenders employee and member who resides in St. Petersburg, Florida. Fittingly, as a Florida native who has long loved manatees, she is a Senior Representative for Defenders' Florida Program where she works to protect the habitat of the threatened Florida manatee. Florida manatees have experienced widescale loss of warm-water refugia and foraging habitat—two of the most significant habitat features necessary for their conservation and recovery—due to human impacts, including groundwater withdrawals and nutrient pollution. Ms. Fleming works both to mitigate these human-caused harms and to restore important habitat features. Her work to enhance manatee habitat includes collaborating with government agencies, power companies, conservation organizations, and other entities to identify, conserve, and restore a statewide system of regional warm-water networks with proximate food sources to help transition manatees away from dependence on artificial warm-water sources, which are being phased out. In addition to observing manatees frequently through her work, Ms. Fleming sees manatees foraging in seagrasses and swimming in Tampa Bay during her near-daily walks through her neighborhood when the weather is cooler when manatees congregate nearby. Even in the hot Florida summer, Ms. Fleming still frequents local sites a few times a week to check for manatees that have stayed in Tampa Bay. Her strong personal connection to the species has led her to educate her neighbors and advocate for signage on responsible manatee viewing practices. She intends to continue these activities indefinitely. Ms. Fleming understands the importance of ensuring that habitat-based harm is considered when issuing incidental take statements and permits, and she worries that the Rescission will allow for unbridled development that further chips away at manatees' foraging grounds and warm-water refuges. If reduced regulation of development reduces the Florida manatee's ability to access these necessary habitat features, Ms. Fleming would not only experience reduced enjoyment of

her manatee-viewing walks but would face also additional hurdles in her professional endeavors to protect and restore warm springs and seagrass beds.

36. Ben Prater is a Defenders employee and member who lives in Arden, North Carolina. He is Defenders' Southeast Program Director and oversees Defenders' work on a variety of public and private lands throughout the Southeast, including Virginia, North Carolina, South Carolina, Florida, Georgia, and Tennessee. His team works on protecting a variety of imperiled species from habitat-based harm: manatees adversely affected by the loss of warm-water refugia and pollution; sea turtles adversely affected by beach renourishment and dredging; gopher tortoises whose dens are destroyed by development; red knots and other shorebirds threatened by sea level rise; and red-cockaded woodpeckers, forest bats, amphibians, and aquatic species adversely affected by logging. For over a decade, Mr. Prater has played an active role in working with a diverse group of stakeholders to update the Forest Plan for the Nantahala and Pisgah National Forests to maximize the protection of conservation values while addressing the needs of local communities and other stakeholders. In 2023, the U.S. Forest Service adopted an updated plan that would radically expand commercial logging and result in a net loss of protections for the most important habitats within the forests. Defenders joined with other conservation organizations to file lawsuits aimed at remedying the legal violations that occurred in the development of the 2023 Forest Plan, including one that directly challenged the biological opinion for the 2023 Forest Plan and its failure to adequately protect four species of ESA-listed bats: the northern long-eared bat, Indiana bat, Virginia big-eared bat, and gray bat. In March 2026, the judge found that the biological opinion was arbitrary and capricious and vacated it. While this should have presented the opportunity for the FWS to go back and produce a biological opinion that adequately protects ESA-listed bats, Mr. Prater is concerned that now that FWS will no longer consider habitat-based harm in its jeopardy analysis and in the biological opinion's incidental take statement, the ESA-listed bats will ultimately receive *less* protection in the Nantahala and Pisgah National Forests. Mr. Prater is a regular visitor to the Pisgah National Forest. He has conducted cave surveys and led "bat hikes" for Defenders' members to try to observe bats at dusk, as well as surveys for imperiled cerulean warblers. In June 2026, he

participated in an educational event with the Pisgah River Rangers and the North Carolina Wildlife Resource Commission educating members of the public about Eastern hellbenders, the largest salamander species in North America, which FWS proposed to list as endangered in 2024. This fall, he will visit the Pisgah National Forest to view the changing leaves, hawk migration, and monarch migration. Early next spring, he will return to the Pisgah to look for cerulean warblers. These forests, the ESA-listed bats that live there, and the variety of other species that call them home are personally important to Mr. Prater. Over the past thirty years, he has explored hundreds of miles of trails and streams and thousands of acres of forested land within the forests for recreation, spiritual renewal, and exploration. He intends to continue to do so as long as he is able, but he is concerned that the Rescission will result in more logging and other activities that mar the beautiful landscapes that he visits, reducing his enjoyment of these places, and reducing his chances of seeing forest bats and other ESA-listed species when he goes there.

37. As these examples illustrate, Defenders' members have significant concrete and particularized interests in endangered and threatened wildlife species and their habitats that are injured by the Services' unlawful rescission of the longstanding regulatory definitions of harm and the Services' unlawful reinterpretations of "harm" and "take." They will continue to be harmed, absent judicial relief.

38. Defenders' members also have significant concrete interests in the Services' lawful application and implementation of statutory procedural requirements, including the requirements: (1) to complete a robust NEPA analysis of the effects of their proposed actions; (2) to comply with ESA section 7(a)(2)'s consultation obligations; and (3) to comply with the APA's requirements to respond to comments and provide a rational explanation for their change in position. These procedural requirements protect Defenders' members' underlying substantive interests in protecting and recovering ESA-listed wildlife species and their habitats. The Services have caused these injuries and will continue to do so absent judicial relief.

**Defendants**

39. Defendant U.S. Fish and Wildlife Service is an agency within the U.S. Department of the Interior. FWS is responsible for administering the ESA's provisions for

terrestrial wildlife, freshwater fish, and certain marine mammals, including by promulgating regulations.

40. Defendant National Marine Fisheries Service is an agency within the U.S. Department of Commerce. NMFS is responsible for administering the ESA's provisions for most marine and anadromous species, including by promulgating regulations.

## LEGAL FRAMEWORK

### Endangered Species Act

41. The ESA has been hailed as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). "The plain intent of Congress" in enacting the ESA was "to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

42. When enacting the ESA in 1973, Congress found it necessary to protect endangered and threatened species as "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation[.]" 16 U.S.C. § 1531(a)(1). To address this threat, Congress passed the ESA to "provide a program for the conservation of . . . endangered species and threatened species" *and* "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." *Id.* § 1531(b). Congress also declared that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the ESA]." *Id.* § 1531(c)(1).

43. "Conservation" and "conserve" mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3). Thus, the ESA's goal is not simply to prevent endangered and threatened species from becoming extinct but also to provide for their full recovery.

44. The ESA protects imperiled species by providing for their listing as "endangered" or "threatened." *Id.* § 1533(a). A species is endangered if it "is in danger of extinction throughout

all or a significant portion of its range." *Id.* § 1532(6). A species is threatened if it is "likely to become an endangered species in the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

45. The Services consider five factors when determining whether a species is endangered or threatened. *Id.* § 1533(a)(1)(A)–(E). The first is the present or threatened habitat destruction, modification, or curtailment of its habitat or range. *Id.* § 1533(a)(1)(A). A species may be listed based on a single factor or a combination of factors. A listing decision must be based solely on the basis of the best available scientific and commercial data. *Id.* § 1533(b)(1)(A).

46. Recognizing the necessity of protecting habitat to ensure conservation, when a species is listed as endangered or threatened, the ESA instructs the Services concurrently to "designate any habitat of such species which is then considered to be critical habitat." *Id.* § 1533(a)(3)(A)(i). "Critical habitat" includes specific areas within the area the species occupies at the time of listing that are essential to the conservation of the species and that may need special management or protection, as well as certain areas not occupied by the species at the time of listing, but that are essential to its conservation. *Id.* § 1532(5). Critical habitat designations must be made "on the basis of the best scientific data available," 50 C.F.R. § 424.12(a), but an area can be excluded from a critical habitat designation based on "economic impact, the impact on national security, and any other relevant impact," provided that certain conditions are met, 16 U.S.C. § 1533(b)(2). Except in certain circumstances, critical habitat designations cannot include the entire geographic area the species can occupy, *id.* § 1532(5)(C), so "critical habitat" generally does not mean all habitat.

47. Section 9(a)(1) of the ESA prohibits the unauthorized "take" of endangered fish and wildlife species, *id.* § 1538(a)(1)(B)–(C), while section 4(d) of the ESA authorizes FWS and NMFS to issue regulations that prohibit, among other things, unauthorized "take" of threatened fish and wildlife species, *id.* § 1533(d). This prohibition applies regardless of whether the "take" occurs within or outside of designated critical habitat. Section 9(a)(1)(G) makes it unlawful for any person to violate such a regulation. *Id.* § 1538(a)(1)(G). Section 9(g) also makes it "unlawful

for any person subject to the jurisdiction of the United States to attempt to commit, solicit another to commit, or cause to be committed, any offense defined in this section." *Id.* § 1538(g). The ESA establishes civil and criminal penalties for unauthorized take, *id.* § 1540(a)–(b), establishes administrative and judicial enforcement authorities, *id.* § 1540(e), delegates broad rulemaking authority to the Services to "promulgate such regulations as may be appropriate to enforce" the statute, *id.* § 1540(f), and under certain circumstances empowers citizens to file suit to enjoin any person alleged to be in violation of the ESA's take prohibitions, *id.* § 1540(g)(1)(A), (g)(2)(A).

48. The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19).

49. Recognizing that take can occur incidental to otherwise lawful activities, Congress created two paths to ensure that take does not jeopardize protected species or adversely modify or destroy critical habitat and is appropriately authorized, minimized, and mitigated to ensure species conservation (i.e., full recovery). The first path, under section 7, applies to federal agency actions, and the second, under section 10, applies to non-federal actions. Both provide liability protection for incidental take if certain requirements are met.

50. Until the Rescission, the Services considered otherwise lawful activities that indirectly but actually killed or injured listed species to constitute incidental take, including significant habitat modification or degradation. Such indirect and unintentional incidental take also occurs in contexts other than habitat destruction, including but not limited to when a vehicle collides with a listed animal on the highway, when a boat strikes a listed animal in the water, or when an off-road vehicle crushes a listed animal.

51. Section 7(a)(2) of the ESA requires federal agencies (action agencies) to ensure that actions they authorize, fund, or carry out are "not likely to jeopardize the continued existence" of any protected species "or result in the destruction or adverse modification" of their designated critical habitat. *Id.* § 1536(a)(2); *see also* 50 C.F.R. §§ 402.03, 402.14. This requirement applies to the promulgation of regulations. 50 C.F.R. § 402.02 (defining "action").

52. This statutory mandate on action agencies is met through consultation with FWS

and NMFS (expert agencies), 16 U.S.C. § 1536(a)(2), whenever an action "may affect" listed species, 50 C.F.R. § 402.14(a). Courts have interpreted the "may affect" requirement as a low bar: "Any possible effect, whether beneficial, benign, adverse or of an undetermined character triggers the consultation requirement." *Karuk Tribe of Cal. v. U.S. Forest Serv*., 681 F.3d 1006, 1027 (9th Cir. 2012) (en banc) (cleaned up). "An agency may avoid the consultation requirement only if it determines that its action will have 'no effect' on a listed species or critical habitat." *Id.*

53. If FWS or NMFS is the action agency, consultation is carried out through internal and/or inter-agency consultation. *See* U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., Endangered Species Consultation Handbook, at 1-5–1-6, E-11 (1998) [hereinafter ESA Consultation Handbook]. In carrying out section 7 consultation, all agencies must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

54. During formal section 7 consultation, the ESA requires that the expert agency prepare a biological opinion. If the expert agency determines that the agency action itself and any resulting incidental take will not violate section 7(a)(2), the expert agency must include an incidental take statement that "specifies the impact of such incidental taking on the species," as well as "reasonable and prudent measures that [are] necessary or appropriate to minimize such impact," and non-discretionary "terms and conditions" for implementing those measures. *Id.* § 1536(b)(4)(i), (ii), (iv). Any incidental take subject to an incidental take statement that is in compliance with the terms and conditions of that statement is not a prohibited take under the ESA. *Id.* § 1536(o)(2); 50 C.F.R. § 402.14(i)(6).

55. If the amount or extent of incidental take specified in the incidental take statement is exceeded, consultation must be reinitiated. 50 C.F.R. §§ 402.14(i)(5), 402.16(a)(1). And the operations causing such take must cease pending reinitiation. ESA Consultation Handbook, at B-32.

56. Similarly, section 10 of the ESA authorizes non-federal persons to obtain incidental take permits that authorize take—under certain circumstances and conditions—when it is "incidental to, and not the purpose of, carrying out an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

57. One of those conditions is the submission of a conservation plan—often known as a habitat conservation plan—that specifies, among other things: the impact of the incidental taking, "steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement those steps." *Id.* § 1539(a)(2)(A)(i)–(ii).

58. An incidental take permit cannot be granted unless the applicant will minimize and mitigate the impacts of the taking "to the maximum extent practicable" and ensure adequate funding, and the incidental taking will not "appreciably reduce the likelihood of the survival and recovery of the species in the wild." *Id.* § 1539(a)(2)(B)(ii)–(iv). The issuance of an incidental take permit is an agency action that requires ESA section 7(a)(2) and NEPA compliance.

**National Environmental Policy Act**

59. NEPA seeks to "encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. Adherence to the procedures set forth in NEPA "ensures that the agency and the public are aware of the environmental consequences of proposed projects." *Seven Cnty.*, 605 U.S. at 177. "Properly applied, NEPA helps agencies to make better decisions and to ensure good project management." *Id.*

60. To accomplish this goal, agencies must prepare a "detailed statement" for proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "Major Federal action" is defined to mean "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A).

61. An agency must issue an environmental impact statement (EIS) for any proposed action that requires an environmental document and "has a reasonably foreseeable significant effect on the quality of the human environment." *Id.* § 4336(b)(1). If it is unclear whether a major Federal action will have a reasonably foreseeable significant effect, federal agencies must prepare an environmental assessment (EA), to make that determination. *Id.* § 4336(b)(2). If the

EA shows the proposed action will not have a significant effect, the agency documents that conclusion in a finding of no significant impact (FONSI). *Id.* Otherwise, the agency must complete an EIS. *Id.*

62. An EIS must address "(i) reasonably foreseeable environmental effects of the proposed agency action; (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented." *Id.* § 4332(2)(C).

63. The requirement to prepare an EA, FONSI, or EIS does not apply if an action is nondiscretionary, *id.* § 4336(a)(4), or falls within a Categorical Exclusion (CE), *id.* § 4336(a)(2).

64. CEs are promulgated by federal agencies, *id.* § 4336c, and are categories of actions that "a Federal agency has determined normally do[] not significantly affect the quality of the human environment," *id.* § 4336e(1). The U.S. Department of the Interior (parent agency of FWS) and the National Oceanic and Atmospheric Administration (NOAA) (parent agency of NMFS) have promulgated CEs for policies, directives, regulations, and guidelines that are "of an administrative, financial, legal, technical, or procedural nature" or whose environmental effects are "too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. § 46.210(i); *accord* Nat'l Oceanic & Atmospheric Admin., Appendix E to Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities: Companion Manual to NOAA Administrative Order 216-6A, at E-14 (2025) [hereinafter NOAA NEPA CM], noaa.gov/sites/default/files/2025-06/TableofNOAAsCEsauthorizedbyNAO216-6A.pdf (listing NOAA's categorical exclusions).

65. An agency cannot invoke a CE unless it evaluates the proposed action to determine if "extraordinary circumstances" exist under which the action has a "significant environmental effect" and requires analysis under NEPA. 43 C.F.R. § 46.205(c)(1); *accord* NOAA NEPA CM at 8–9. Pursuant to Interior regulations, extraordinary circumstances exist in multiple circumstances, including if the proposed action is found to have significant impacts on "species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species," 43 C.F.R. § 46.215(g); on "natural resources . . . park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks . . . wetlands; floodplains; national monuments; migratory birds; and other ecologically significant or critical areas," *id.* § 46.215(b); or is directly related to "other actions that implicate potentially significant environmental effects," *id* § 46.215(e), or "involve unique or unknown environmental risks." *Id.* at 46.215(c). Pursuant to NOAA NEPA Policies and Procedures, extraordinary circumstances exist if the proposed action involves considerable adverse effects on "species or habitats protected by the [ESA]," or areas with "unique environmental characteristics," like "wetlands and floodplains, national marine sanctuaries, federal marine protected areas, or marine national monuments." NOAA NEPA CM at 9.

**Administrative Procedure Act**

66. The APA establishes a right to judicial review of "agency action." 5 U.S.C. §§ 701–706. Agency action is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13).

67. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." *Id*. § 706(2). In examining the lawfulness of an agency action, the reviewing court "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706.

68. Agency action is arbitrary and capricious, where, among other things: the agency

"entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or when it fails to "offer a rational connection between the facts found and the choice made," *id.* at 52 (quotation marks omitted). "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

69. When an agency changes its mind and reverses its position, at a minimum: the agency must announce the change, the new policy must be "permissible under the statute," there must be "good reasons" for it, and the agency must believe it to be better. *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The agency also must "examine the relevant data and articulate a satisfactory explanation for its action." *Id.* at 513 (quoting *State Farm*, 463 U.S. at 43). And when an agency reverses a prior position that "rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account," it must do more. *Id*. at. 515. It must supply a "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id*. at 516.

70. "The question of "[w]hether agency action is 'not in accordance with law' is a question of statutory interpretation," *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010), and courts will not "rubber-stamp administrative decisions they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (cleaned up). "Agencies have no special competence in resolving statutory ambiguities," but "courts do" and "use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." *Loper Bright*, 603 U.S. at 400–01 (cleaned up).

//

//

## GENERAL ALLEGATIONS AND FACTUAL BACKGROUND

### The Biodiversity Crisis and Habitat Loss

71. Biological diversity—biodiversity for short—is the variety of life at all levels: genes, species, and ecosystems. It underpins the ecosystem services to which our economy, food systems, and health are inextricably linked: pollinating crops, keeping our waterways clean, and buffering us from diseases like Lyme and malaria.

72. But biodiversity is in crisis. The Living Planet Index, a leading global metric that measures the health of Earth's biodiversity by tracking population trends of thousands of vertebrate species, reports an average decline of 68 percent in monitored populations of vertebrate species around the world over the past fifty years. Approximately one million species are at risk of extinction globally, and in the United States, 34 percent of plants and 40 percent of animals face that risk.

73. In 2025, the World Economic Forum listed biodiversity loss as one of the most significant global risks for the next decade, second only to extreme weather events, and ahead of a host of other economic, environmental, geopolitical, societal, and technological risks, such as the risks posed by state-based armed conflict, adverse outcomes of AI technologies, unemployment, crime, and supply-chain disruptions.

74. Habitat destruction or alteration from human activity is a primary cause of species decline and biodiversity loss.

### For Decades, the Services Defined Harm by Regulation to Include Habitat Modification or Degradation

75. As noted above, the ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" or to attempt to do any of these acts. 16 U.S.C. § 1532(19).

76. It does not further define "harm" or the rest of terms included in the definition of "take," but in enacting the ESA, Congress made clear that "[t]ake is defined . . . in the broadest possible manner to include *every conceivable way* in which a person can 'take' or attempt to 'take' any fish or wildlife." S. Rep. No. 93–307, 1973 U.S.C.C.A.N. at 2995 (1973) (emphasis added). A House Report underscored the breadth of the "take" definition by noting that it

prohibited take, "*whether intentional or not*." H.R. Rep. No. 93–412, at 11 (1973) (emphasis added). The Report explained that the definition "would allow, for example, the Secretary to regulate or prohibit the activities of birdwatchers where the effect of those activities might disturb the birds and make it difficult for them to hatch or raise their young." *Id.*

77. In 1975, just two years after the enactment of the ESA, FWS promulgated a regulatory definition of "harm": "'Harm' in the definition of 'take' in the Act means an act or omission which actually injures or kills wildlife, including acts which annoy it to such an extent as to significantly disrupt essential behavioral patterns, which include, but are not limited to, breeding, feeding or sheltering; significant environmental modification or degradation which has such effects is included within the meaning of 'harm.'" 40 Fed. Reg. 44,412, 44,416 (Sept. 26, 1975). When doing so, FWS noted that the definition was consistent with Congress' stated purpose of the ESA to provide a means to conserve the ecosystems on which endangered and threatened species depend. *Id*. at 44,413.

78. Subsequently, in 1981, FWS revised the regulatory definition of "harm" to clarify that habitat modification constitutes harm *only* when it actually kills or injures wildlife. 46 Fed. Reg. 54,748 (Nov. 4, 1981). Specifically, FWS explained that "[s]uch act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3 (2024); *see also* 46 Fed. Reg. at 54,749. Until the Rescission, this regulatory definition had been in place without amendment or revision.

79. FWS has also previously recognized that, while the regulatory definition was not limited to designated critical habitat, defining "harm" to include habitat modification or degradation that results in actual death or injury dovetailed with other methods of protecting habitat such as FWS's land acquisition authority under section 5 of the ESA, as well as section 7's requirement that federal agencies ensure that their actions are not likely to destroy or adversely modify designated critical habitat.

80. In revising the regulatory definition of harm in 1981, FWS prepared a draft EA, which was made available to the public for comment. 46 Fed. Reg. 29,490, 29,490 (June 2,

1981).

81. Although Congress amended the ESA after the 1981 FWS regulatory definition, including in 1982, 1988, and 1995, it has never altered the statutory definition of "take" or added a statutory definition of "harm," even though it was well aware of the regulatory definition and the broad understanding that the ESA's prohibition on "take" also prohibited unpermitted take incidental to an otherwise lawful activity.

82. Recognizing the need to provide a mechanism by which to authorize such incidental take, in 1982, Congress amended the ESA to add section 10, which allows the Services to grant permits to authorize otherwise lawful activities that result in take that is "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. 1539(a)(1)(B). At the same time, it substantially amended section 7 to include the incidental take statement requirement for take of listed species incidental to agency actions. *Id.* § 1536(b)(4). The House Report made clear that these amendments were made to address "incidental and unintentional takings." H.R. Rep. 97–567, at 15 (1982).

83. Both the House and Senate Conference Reports explained that section 10's incidental take provision was modeled after a plan to protect endangered butterflies from a development project that threatened incidental harm to the butterflies through habitat modification. H.R. Rep. No. 97–835 (Conf. Rep.), at 32–33 (1982); S. Rep. No. 97–418, at 9–10 (1982) Further, the House Report stated that "[b]y use of the word 'incidental' the Committee intends to cover situations in which it is known that a taking will occur if the other activity is engaged in but such taking is incidental to, and not the purpose of, the activity." H.R. Rep. No. 97–567, at 31 (1982).

84. The House Conference Report directed that, "[t]o the maximum extent possible," the Services should utilize the authority of section 10 "to encourage creative partnerships between the public and private sectors and among governmental agencies in the interest of species and habitat conservation." H.R. Rep. No. 97–835 (Conf. Rep.), at 30 (1982).

85. In amending section 7 to add section 7(b)(4), Congress provided a mechanism for the issuance of incidental take statements to accompany biological opinions when the Services

concluded that a federal action would not result in jeopardy or the destruction or adverse modification of designated critical habitat but would nevertheless result in some take incidental to the otherwise lawful action. Previously, a federal agency could complete consultation and receive a "no jeopardy" biological opinion, yet the agency or an applicant carrying out the action could still face liability under section 9 for any individual animals taken in the course of an otherwise lawful activity. In other words, meeting the no jeopardy standard provided no legal shelter from the take prohibition. The Conference Report explained that the new subsection was added to resolve this by requiring the Services, when issuing a no jeopardy opinion (or a jeopardy opinion with reasonable and prudent alternatives), to specify the amount or extent of anticipated incidental take, the reasonable and prudent measures necessary to minimize its impact, and the terms and conditions for implementing those measures. *Id.* at 25–28. Take that occurs in compliance with the incidental take statement is exempt from section 9 liability under section 7(o)(2).

86. In 1995, the Supreme Court upheld by a 6-3 vote the 1981 FWS regulatory definition of harm, rejecting a challenge to the inclusion of the phrase "significant habitat modification or degradation where it actually kills or injures wildlife." *Sweet Home*, 515 U.S. at 708.

87. In *Sweet Home*, the Court examined the ordinary meaning, purpose, and structure of the ESA, as well as its legislative history and canons of statutory construction, and found that: "In the context of the ESA, that definition [of harm] naturally encompasses habitat modification that results in actual injury or death to members of and endangered or threatened species." *Id.* at 697.

88. The *Sweet Home* majority expressly rejected the dissent's arguments that "harm," and "take" more broadly, is limited to "affirmative conduct intentionally directed against a particular animal or animals." *Id.* at 702 n.15; *see also id.* at 696-703. With respect to harm specifically, the majority found that "unless the statutory term 'harm' encompasses indirect as well as direct injuries, the word has no meaning that does not duplicate the meaning of other words" in the statutory definition of take. *Id.* at 697–98. The majority also found that the 1982

amendments authorizing the issuance of section 7 and 10 incidental take permits "strongly suggests that Congress understood § 9(a)(1)(B) to prohibit indirect as well as deliberate takings." *Id.* at 700.

89. In 1999, in response to the listing of Pacific salmon and steelhead stocks and questions from potentially affected parties of whether NMFS also interpreted harm to include habitat destruction, NMFS promulgated its own regulatory definition of "harm," to "provide[] clear notification to the public that habitat modification or degradation may harm listed species, and, therefore, constitutes take under the ESA" and to "ensur[e] consistency between NMFS and . . . FWS." 64 Fed. Reg. 60,727, 60,727 (Nov. 8, 1999). In doing so, NMFS prepared a draft EA, which it made available to the public for comment. 63 Fed. Reg. 31,962, 31,963 (June 11, 1998).

90. NMFS's definition—which, like FWS's, had also been in place without amendment or revision until the Rescission—provided that: "*Harm* in the definition of 'take' in the Act means an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102 (2025).

91. Accordingly, for decades, the Services recognized that unauthorized significant habitat modification or degradation that kills or injures endangered fish or wildlife (or threatened fish or wildlife protected by a relevant section 4(d) rule) has been prohibited by section 9 of the ESA.

92. As a result, for decades, countless biological opinions resulting from section 7 consultations have considered the impacts of significant habitat modification or degradation that kills or injures listed fish or wildlife when determining whether proposed actions authorized, funded, or carried out by federal agencies, including actions on federal lands, are likely to jeopardize the continued existence of a protected species or destroy or adversely modify its critical habitat. Incidental take statements in those biological opinions have included measures to minimize the impact of incidental take caused by habitat modification or degradation that kills or injures listed fish or wildlife, as well as mandatory terms and conditions to implement those

measures. When habitat modification or degradation has caused incidental take to be greater than expected, reinitiation of consultation has been required.

93. And for decades, otherwise lawful activities on state or private land or in the ocean that may incidentally kill or injure members of protected species, including by significantly modifying or degrading their habitat, have required an incidental take permit and conservation plan under section 10 that contains measures the permittee agrees to take to minimize and mitigate take in exchange for assurance that they will not be liable for the incidental take of protected species. These measures can include: limiting the timing and location of harmful activities; protecting existing habitat through conservation easements, management practices, and other measures; restoring damaged former habitat; and acquiring or creating new habitat.

94. These permits have been widely used. To date, FWS has approved habitat conservation plans for more than 1,300 incidental take permits. Research has demonstrated that species with a habitat conservation plan are less likely to be considered extinct or declining and more likely to be considered stable or improving than species without a habitat conservation plan.

95. For example, when FWS listed the California gnatcatcher as threatened in 1993, a primary basis for the listing was the loss and fragmentation of the gnatcatcher's coastal sage scrub habitat, which was noted at the time to be one of the most depleted types of habitat in the entire country. But by 2010, FWS reported that much of the bird's remaining habitat was covered, or expected to be covered, by large, regional conservation plans that have regulated and minimized and mitigated destruction of gnatcatcher habitat due to urban and agricultural development, including by directing these activities away from certain areas, allowing for the establishment of core habitat preserves, and reduction in habitat fragmentation. Accordingly, FWS concluded that while the threat of habitat destruction remained, it was greatly reduced.

**The Prevention of Habitat Destruction is Imperative for the Survival and Recovery of ESA-Listed Species**

96. All species rely on habitat for survival, but for those species that have very

specific needs for shelter, food, or reproduction—habitat specialists—the link between human-caused habitat destruction or degradation and resulting species decline is even stronger.

97. For instance, the threatened northern spotted owl relies primarily on old growth and mature forests for habitat, from the San Francisco Bay, through northern California, western Oregon and Washington, to southern British Columbia. These forests must have high rates of canopy closure, meaning that when standing at any point within the forest, 60 to 80 percent of the sky above is covered by vegetation. They must include trees of different heights (known as a multilayered canopy), a high number of large trees with deformities (like cavities or broken tops), large amounts of fallen trees and other debris on the ground, and enough open space below the canopy for the owls to have room to fly. Logging has fragmented and substantially reduced the amount and quality of this type of habitat.

98. Across the country, red-cockaded woodpecker, also listed as threatened under the ESA, has its own special habitat needs. It is the only woodpecker that makes its home in living trees. Not just any living trees will do—only old-growth pines that are at least 60 years old are large enough to support the red-cockaded woodpecker's nest cavities and soft enough for the birds to excavate. But forest clearing for development, silviculture, and Department of Defense installations threaten the long-leaf pine forests where these shelter trees grow in the southeastern United States.

99. When FWS downlisted the red-cockaded woodpecker from endangered to threatened in 2024, it noted that lack of suitable habitat is the primary remaining threat to the red-cockaded woodpecker's viability, and accordingly, while FWS determined the red-cockaded woodpecker is not currently in danger of extinction, it is still likely to become so within the foreseeable future.

100. The threatened Florida manatee has specialized needs for food—or forage—habitat. Because of the way their digestive system works, manatees need a plentiful supply of high-fiber, slow-digesting foods, such as seagrass—averaging up to nine percent of their body weight each day.

101. But seagrass resources have declined along Florida's Atlantic coast over the past

fifteen years due to human activities such as dredging, filling, boating, pollution causing eutrophication, and coastal development. Eutrophication—caused by excess phosphorous and nitrogen from runoff and septic systems—is of significant concern. This eutrophication results in algal blooms that block out light that seagrass need to photosynthesize.

102. Just a few years ago, poor water quality led to repeated algal blooms that decimated seagrass beds in the Indian River Lagoon, an important feeding ground for manatees. Without sufficient access to their primary food source, Florida manatees starved to death at an alarming rate, with an Unusual Mortality Event declared under the MMPA between December 2020 and April 2022 that recorded 1,255 manatee deaths.

103. Salmon, trout, and other anadromous fish—those that migrate between freshwater streams and saltwater marine habitats at different stages of their lives—have specialized needs for breeding—or spawning. Successful spawning is arduous. It involves long migrations and swimming upstream and requires access to areas with suitable gravel size, water temperature, depth, and velocity.

104. Since 1997, multiple distinct population segments of steelhead trout, an anadromous salmonid, have been listed as threatened or endangered under the ESA throughout California, Oregon, Washington, and Idaho. Their spawning habitat is negatively impacted by forestry, agriculture, mining, development and urbanization, and dams for agriculture, flood control and hydropower. Dams are a particularly significant threat to the habitat of these species—they can prevent movement between the marine and freshwater environments and confine fish to the downstream reaches of a river that are lower quality spawning habitat. Dams can also kill fish attempting to migrate upstream, or make the process harder, unnecessarily tiring them out on their upstream journey, and therefore making it more difficult for them to successfully reproduce.

**The Rescission and Reinterpretation**

105. On April 17, 2025, the Services issued a proposed rule to rescind their decades-old regulatory definitions of "harm" and to reinterpret "take," including "harm" and the other eight verbs in the definition of take, as limited to "an affirmative act directed immediately and

intentionally against a particular animal—not an act or omission that indirectly and accidentally causes injury to a population of animals." 90 Fed. Reg. 16,102, 16,103 (April 17, 2025) (cleaned up) (Proposed Rule).

106. On July 14, 2026, the Services issued the Final Rule rescinding the regulatory definitions of harm as they proposed to do in the Proposed Rule. 91 Fed. Reg. 43,300 (July 14, 2026). The Services did not promulgate a replacement definition. They did, however, adopt Justice Scalia's rationale as articulated in his *Sweet Home* dissent that the statutory term "take," including the term "harm," "should be construed to require an affirmative act directed immediately and intentionally against a particular animal—not an act or omission that indirectly and accidentally causes injury to a population of animals." *Id*. at 43,301 (cleaned up).

107. The Services presented no facts or data on habitat loss, or on species' reliance on habitat for shelter, feeding and breeding in either the Proposed or Final Rules. In neither document did they analyze or attempt to quantify the impacts of ESA protections that, for decades, have been based on an interpretation of prohibited "take" that included habitat-based harm. And in neither document did they analyze or attempt to quantify the impacts to species and their habitats that will result from the way those protections will change in light of their reinterpretation of "take" to exclude habitat-based harm.

108. The Services failed to analyze or attempt to quantify the effects of adopting a statutory interpretation that limits "take" to affirmative acts directed intentionally against a particular animal. The Services did not discuss the implications of their reinterpretation of the statutory term "take" for the regulation of incidental take outside of the context of habitat destruction or modification.

109. The Rescission was not required by any law or court order. In fact, the Supreme Court upheld FWS's 1981 regulatory definition of "harm" in *Sweet Home* and specifically concluded that Congress intended for "take" to include indirect, as well as direct actions, and that the Services' regulatory definition of harm aligned with the ESA's text and structure, its legislative history, and Congress's intent when it amended the ESA in 1982 to allow for the permitting of incidental take. *Sweet Home*, 515 U.S. at 695, 697–98, 700–01, 704.

110. Nevertheless, the Services' stated reason for the Rescission is that, following the Supreme Court's decision in *Loper Bright*, they were required to adhere to the single, best meaning of the statute, and that Justice Scalia's *Sweet Home* dissent's narrow interpretation of "take" represents the single, best meaning of the statute, 91 Fed. Reg. at 43,301–02, notwithstanding that a six-justice majority of the Supreme Court rejected that interpretation.

111. *Loper Bright* overruled what was known as the *Chevron* Step Two standard of judicial deference to agency regulatory interpretation of ambiguous statutory terms. *Loper Bright*, however, did not require agencies to rescind and reinterpret existing regulatory definitions of statutory terms nor did it invalidate any existing regulatory definitions of statutory terms. Indeed, the Supreme Court made clear that it is the job of the courts, not agencies, to determine the single, best meaning of a statute. Further, it made clear that the holdings of prior cases decided under the *Chevron* Step Two standard are still binding precedent. It also recognized that "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time," such as the Services' interpretation of "harm" at issue here, "may be especially useful in determining the statute's meaning." *Loper Bright*, 603 U.S. at 394.

112. The Rescission will significantly affect the way the Services implement and enforce the ESA, including but not limited to sections 7, 9, and 10.

113. For instance, the Services no longer consider significant habitat modification or degradation that kills or injures endangered wildlife species (or threatened wildlife species with a relevant 4(d) rule) to be prohibited "take" that violates section 9 in the absence of appropriate authorization.

114. Accordingly, section 7 consultations will no longer consider significant habitat modification or degradation that kills or injures such species when determining whether a federal agency action jeopardizes the existence of listed species or whether resulting habitat-based incidental take violates section 7(a)(2)'s mandates. Incidental take statements in biological opinions will no longer include reasonable and prudent measures to minimize the impacts of such habitat modification or degradation.

115. Similarly, the Services will no longer require non-federal persons to apply for

incidental take permits for incidental take caused by significant habitat modification or degradation that incidentally kills or injures protected species in order to avoid liability for the unauthorized take of listed species, nor will such persons be required to prepare habitat conservation plans or minimize and mitigate the impacts of significant habitat modification or degradation that kills or injures protected species in order to avoid liability. Indeed, in the Final Rule, the Services note that current permit-holders who are "mitigating only for habitat impacts that were considered prohibited take when their permit was issued . . . may choose to return their permit in order not to have to continue expending resources to mitigate[.]" 91 Fed. Reg. at 43,305.

116. Additionally, the Services now consider "take" to apply only "to affirmative acts which are directed immediately and intentionally against a particular animal—not an act or omission that indirectly and accidentally causes injury to a population of animals." 91 Fed. Reg. at 43,301 (citing *Sweet Home*, 515 U.S. at 719–20 (Scalia, J., dissenting)) (cleaned up).

117. Accordingly, section 7 consultations will no longer consider indirect take when determining whether a federal agency action jeopardizes the existence of listed species or whether such take violates section 7(a)(2)'s mandates. Incidental take statements in biological opinions will no longer include reasonable and prudent measures to minimize the impacts of such indirect take.

118. Similarly, the Services will no longer require non-federal persons to apply for incidental take permits for indirect and unintentional incidental take to avoid liability for the unauthorized take of listed species, such as when a vessel inadvertently strikes a whale or if a tree containing protected species is felled, if not for the express purpose of killing or capturing them. Nor will such persons be required to prepare conservation plans or minimize and mitigate the impacts of such indirect and unintentional incidental take to avoid liability.

119. The Services did not engage in ESA section 7 consultation prior to issuing the Final Rule, asserting that the ESA "does not place a consultation obligation on the Service's administration of the Act." 91 Fed. Reg. at 43,316.

120. The Services did not prepare a draft EA or draft EIS for public notice and

comment, claiming such NEPA analysis was unnecessary because the Rescission is "nondiscretionary" or, in the alternative, falls within the NEPA CEs for regulations of "an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." *Id.* at 43,316.

121. The Services did not explain why the environmental effects of the Rescission are "too broad, speculative, or conjectural to lend themselves to meaningful analysis." 43 C.F.R. § 46.210(i). In fact, they are specific and concrete. Among other things, in undertaking a NEPA analysis of the effects of the Rescission, the Services could have, but did not, review completed or pending biological opinions, incidental take statements, incidental take permits, and habitat conservation plans; determine the extent of protections in those documents that are based on an interpretation of "take" that includes indirect and unintentional harm, including habitat-based harm; and consider the impacts on species of the loss of those protections.

122. The Services did not explain whether "extraordinary circumstances" exist that would render a NEPA CE inapplicable.

123. The Services did not identify how the Rescission will "later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. §46.210(i).

124. The Services did not issue an EA, a FONSI, or an EIS for the Final Rule.

125. Concurrent with the Final Rule, FWS published a five-page document titled "Categorical Exclusion Documentation for NEPA Compliance: Final rule for the Rescission of the regulatory definition of 'harm'" (FWS Categorical Exclusion Document).

126. Upon information and belief, at the time of the filing of this First Amended Complaint, NMFS has not published a document explaining its invocation of a NEPA CE.

127. In neither the Final Rule nor the FWS Categorical Exclusion Document do the Services explain why the environmental effects of the Rescission are "too broad, speculative, or conjectural to lend themselves to meaningful analysis" or identify how the Rescission will "later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. § 46.210(i).

128. In the FWS Categorical Exclusion Document, FWS states that it has evaluated

"extraordinary circumstances" that would render a NEPA CE inapplicable and has determined that no such extraordinary circumstances apply.

129. FWS acknowledges that some might find a number of enumerated "extraordinary circumstances" applicable, particularly, significant impacts on ESA-listed species, a relationship to other actions with potentially significant environmental effects, and unique or unknown environmental risks. FWS Categorical Exclusion Document at 3 (referencing 43 C.F.R. § 46.215(c), (e), (g)). However, FWS concludes that these extraordinary circumstances are not implicated because the Rescission "does not directly authorize or result in any physical changes to the environment." *Id.*

130. The Services received over 350,000 comments on the Proposed Rule, including comments from the Attorneys General of the Commonwealth of Massachusetts and the States of Arizona, California, Colorado, Connecticut, Illinois, Maryland, Maine, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington explaining that they rely on the longstanding regulatory definitions of harm to assist them in carrying out their role in protecting species, and that adoption of the Proposed Rule would impose financial, administrative, and regulatory burdens on their states. Natural resource agencies, including those in Colorado, Connecticut, Georgia, Hawaii, Massachusetts, Maryland, Minnesota, Missouri, North Carolina, North Dakota, New Jersey, New York, Oregon, Vermont, and Washington also submitted comments that opposed the Rescission as set forth in the Proposed Rule and highlighted their reliance on the existing regulatory definitions of harm. Among other things, they noted that the Rescission would make it more difficult and expensive for them to protect ESA-listed species and those species' habitats within their borders, as well as game species and native pollinators that share those habitats. They noted that by disincentivizing measures like habitat conservation plans and proactive conservation benefit agreements, the Rescission would result in more species being listed and cause them to spend more resources to try to recover listed species in the long run.

131. Tribal nations also submitted comments opposing the Proposed Rule, citing among other things reliance on salmon and other anadromous fish for food, culture, and spiritual

practices, as well as the economic significance of such fish, and expressed concerns that that the adoption of the Proposed Rule would weaken the tools such as habitat conservation plans, recovery plans, and biological opinions that protect ESA-listed anadromous fish species by protecting their habitat, undermining investments made by Tribes to promote salmon recovery, and putting at risk future Tribal harvest opportunities and hatchery operations central to their reserved rights and economic survival.

132. And individuals across the country submitted comments in opposition to the Rescission, including farmers concerned with the impact of the Proposed Rule on pollinator species, like native bees, that they rely on to pollinate their crops, and others concerned about the impact of the Proposed Rule on ESA-listed bats that eat mosquitoes and other insects, and the consequent need for more insecticide use.

133. Numerous environmental organizations, including Defenders, expressed concerns in their comments that, if finalized, the Rescission described in the Proposed Rule would be inconsistent with the ESA and binding caselaw; that the Services did not follow proper procedures required by the ESA, NEPA, and APA in promulgating the Proposed Rule; and that the Rescission would undermine protections pursuant to ESA sections 7, 9, and 10 that protect individual members of endangered species—and individual members of threatened species with applicable section 4(d) regulations—by protecting their habitats.

134. In the Final Rule, the Services acknowledged in passing reliance interests raised by the commenters but did not quantify them or meaningfully address them. Instead, Services stated that they "considered the reliance interests and determined that they are entitled to no or diminished weight." 91 Fed. Reg. at 43,309.

## CLAIMS FOR RELIEF

### First Claim for Relief
### APA Violations

135. Plaintiff hereby realleges and incorporates each allegation set forth in paragraphs 1 through 134 of this Complaint.

//

The Rescission is Contrary to Law

136. The Services' new interpretation of the statutory term "take" (which includes the term "harm") is contrary to the ordinary meaning, purpose, and structure of the ESA; conflicts with the binding precedent of *Sweet Home*; is inconsistent with the statutory mandate of, and frustrates the congressional policy underlying, the ESA; and is not the "single, best meaning" of these statutory terms.

137. The Rescission is unlawful within the meaning of the APA. 5 U.S.C. § 706(2).

The Services Failed to Consider Important Aspects of the Problem and Failed to Engage in Rational Decision-making

138. The Services failed to consider important aspects of the Rescission.

139. For instance, the Services did not explain, or even mention, the extent of habitat destruction in the United States or the impacts of such habitat destruction on ESA-listed species, and how the Rescission would affect the Services' ability to address habitat loss and degradation in administering the ESA.

140. Nor did the Services explain, or even mention, the extent to which ESA-listed species have benefited from an interpretation of harm that includes significant habitat modification or degradation that actually kills or injures ESA-listed species. Nor did they attempt to describe the impacts of losing those protections because of the Rescission.

141. Similarly, the Services did not explain, or even mention, the impact of the Rescission on indirect and unintentional incidental take that occurs in contexts other than habitat modification or degradation as a result of their adoption of Justice's Scalia's interpretation of take as articulated in his dissent in *Sweet Home*.

142. Moreover, the Services did not discuss whether the Rescission and limiting the statutory interpretation that "take" to affirmative acts directed immediately and intentionally at particular animals will prevent them from implementing the ESA in a manner that achieves Congress's express purposes of "provid[ing] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "provid[ing] a program for the conservation of such endangered species and threatened species." 16 U.S.C. §

1531(b); *see also id.* § 1531(c)(1) (declaring policy of Congress that all federal agencies shall seek to conserve listed species); *id.* § 1532(3) (defining conservation).

143. Because they did not consider relevant facts, including facts about habitat destruction in the United States, the impacts of habitat destruction on ESA-listed species, the beneficial effects of the prior regulatory definitions of harm on ESA-listed species, or the impacts of the Services' new statutory interpretation of "take" and "harm" on ESA-listed species, the Services have failed to provide a rational connection between the choice that they made and any relevant facts.

144. Rather than basing their choice on relevant facts, the Services based their choice on an incorrect reading and misapplication of *Loper Bright*, purporting to replace the binding precedent of the *Sweet Home* majority decision with the views of the three-justice dissent, based on nothing more than the Services' assertion that the dissent is the better reading of the statute.

145. The Services have failed to explain how adopting an interpretation of "take" and "harm" that the Supreme Court majority rejected in *Sweet Home* squares with that binding precedent as well as with the text, structure, and purpose of the ESA.

146. The Rescission is unlawful within the meaning of the APA. 5 U.S.C. § 706(2).

<u>The Services Failed to Provide a Reasoned Explanation for the Reversal of a Long-Held Position</u>

147. For decades, the Services relied on the regulatory definitions of harm in implementing the ESA, including sections 7, 9, and 10, to prevent, minimize, and/or mitigate the impacts of habitat-based harm on ESA-listed species and to promote their conservation and recovery. But when rescinding the regulatory definitions of harm, they failed to engage with any of the facts that underlay that policy or point to any facts that justify reversing it. Instead, they suggest—without explanation or evidence—that the abandonment of these statutory tools to address habitat-based harm will not significantly undermine the conservation of endangered and threatened species.

148. For decades, the Services relied on a statutory interpretation of "take" that included incidental take resulting from an otherwise lawful activity, not one that limited "take" to

affirmative acts directed immediately and intentionally against a particular animal. But in advancing this new statutory interpretation in the Rescission, they failed to engage with any of the facts that underlay the prior policy or point to any facts that justify reversing it.

149. For decades, States and Tribes have relied on the Services to use the ESA's tools to protect species within their boundaries by protecting their habitats. For decades, farmers have relied on the Services to use these tools to protect pollinator species, like bees, they rely on to pollinate their crops. For decades, members of environmental organizations like Defenders have relied on the Services to use these tools to protect species they care about, as well as their aesthetic, recreational, and other interests in their habitats. The Services have failed to address these reliance interests in any meaningful way.

150. The Rescission is unlawful within the meaning of the APA. 5 U.S.C. § 706(2).

**Second Claim for Relief**
**Failure to Comply with ESA Section 7(a)(2)**

140. Plaintiff hereby realleges and incorporates each allegation set forth in paragraphs 1 through 134 of this Complaint.

141. The Rescission is an "agency action authorized, funded, or carried out" by the Services. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02.

142. The Rescission adversely affects listed species or critical habitat by undermining the foundation of several ESA provisions that have protected species by protecting their habitat and prevented, minimized, and mitigated injury and death to wildlife caused by habitat modification or degradation or take not directed immediately and intentionally against a particular animal, but incidental to an otherwise lawful activity.

143. The Services' Rescission is discretionary.

144. The Services have not engaged in Section 7 consultation regarding the Rescission, in violation of ESA Section 7(a)(2). 16 U.S.C. § 1536(a)(2).

145. The Services have not ensured that the Rescission is "not likely to jeopardize the continued existence of any endangered species or threatened species" or destroy or adversely modify their critical habitat, in violation of ESA Section 7(a)(2). *Id.*

146. The Rescission is in violation of the ESA. *Id.* § 1540(g)(1)(A).

**Third Claim for Relief**
**Failure to Comply with NEPA**

147. Plaintiff hereby realleges and incorporates each allegation set forth in paragraphs 1 through 134 of this Complaint.

148. The Rescission is a "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

149. The Rescission is a "major Federal action." *Id*. § 4336e(10)(A). The promulgation and rescission of regulations pursuant to the ESA is under the substantial control of both FWS and NMFS. *See id.*

150. The Rescission has a "reasonably foreseeable significant effect on the quality of the human environment." *Id.* § 4336(b)(1).

151. The Rescission is discretionary. *See id.* § 4336(a)(4).

152. The Rescission does not qualify for a categorical exclusion (CE). *See id.* § 4336(a)(2). The Rescission is not of an administrative nature. Its effects are not too broad, speculative, or conjectural to lend themselves to meaningful analysis. Its effects will not be subject to the NEPA process at a later date, either collectively or on a case-by-case basis.

153. The Services did not adequately evaluate whether "extraordinary circumstances" exist that would render any CE inapplicable. *See* 43 C.F.R. § 46.205(c)(1); NOAA NEPA CM at 8–9. Extraordinary circumstances exist that prohibit the use of any CE in this instance. *See* 43 C.F.R. § 46.215; NOAA NEPA CM at 9.

154. The Services' failure to comply with NEPA before rescinding the regulatory definitions of harm and reinterpreting "harm" and "take" to exclude significant habitat modification or degradation that actually kills or injures ESA-listed wildlife and to limit "take" to affirmative conduct intentionally directed against a particular animal or animals violates NEPA and is unlawful within the meaning of the APA. 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

1. Declare that the Services acted contrary to law within the meaning of the APA in adopting their new interpretation of the statutory term "take" in promulgating the Final Rule;
2. Declare that the Services violated the ESA, NEPA, and the APA in promulgating the Final Rule;
3. Hold unlawful and set aside the Final Rule, reinstating the 1981 FWS and 1999 NMFS regulatory definitions of harm;
4. Award Plaintiff its reasonable costs, and expenses, including attorney fees, associated with this litigation; and
5. Award Plaintiff any other relief as this Court may deem just and proper.

Dated: September 28, 2026

_/s/ Erica H. Pencak__________

JANE P. DAVENPORT
(California Bar No. 193275)
ERICA H. PENCAK, *pro hac vice*
(District of Columbia Bar No. 90041087)
DEFENDERS OF WILDLIFE
1130 17th Street NW
Washington, DC 20036
(202) 772-3274
jdavenport@defenders.org
epencak@defenders.org

RYAN ADAIR SHANNON, *pro hac vice*
(Oregon Bar No. 15537)
DEFENDERS OF WILDLIFE
2009 NE Alberta St. #207
Portland, OR 97211
(503) 899-0663
rshannon@defenders.org

WILLIAM NAZAR CARLON
(California Bar No. 305739)
LAW OFFICE OF WILLIAM CARLON
437 Post St.
Napa, CA 94559
(530) 514-4115

*Attorneys for Plaintiff Defenders of Wildlife*